# IN THE SUPREME COURT OF IOWA

No. 15–0671

Filed June 9, 2017

Amended August 15, 2017

**STATE OF IOWA,**

Appellee,

vs.

**MARTHA ARACELY MARTINEZ,**

Appellant.

Appeal from the Iowa District Court for Muscatine County, Stuart P. Werling, Judge.

Defendant seeks interlocutory review of denial of motion to dismiss. **REVERSED AND REMANDED WITH DIRECTIONS.**

Philip B. Mears of Mears Law Office, Iowa City, for appellant.

Thomas J. Miller, Attorney General, Darrel Mullins, Assistant Attorney General, and Alan R. Ostergren, County Attorney, for appellee.

Lori T. Chesser and Sarah E. Crane of Davis Brown Law Firm, Des Moines, for amici curiae DREAM Iowa, CASA of Sioux County, Immigrant Allies of Marshalltown, Diocese of Davenport Immigration Program, Casa Latina Mary Treglia Community House, Southwest Iowa Latino Resource Center, and Justice for Our Neighbors.

John A. Hathaway of Kasaby & Nicholls, LLC, Omaha, Nebraska, Bram T.B. Elias, University of Iowa College of Law Clinical Law Programs, Iowa City, and Rita Bettis of ACLU of Iowa, Des Moines, for amicus curiae ACLU of Iowa.

**APPEL, Justice.**

In this case, we are called upon to determine if an undocumented noncitizen brought to Iowa as an eleven-year-old child by her parents, educated in Iowa public schools, who has lived in Iowa continuously, who is a mother of four children who are citizens of the United States, and who applied for and was granted deferred action under the Department of Homeland Security's Deferred Action for Childhood Arrivals (DACA)[1] program, may be prosecuted by State authorities for using false documents to obtain federal employment authorization even though federal law pervasively regulates employment of undocumented noncitizens. The answer to this question is no.

**I. Factual Background and Proceedings.**

**A. Facts Surrounding Martha Martinez.** Martha Martinez came to Muscatine with her parents in 1997 when she was eleven years old. She attended Muscatine public schools and worked for several different employers in Muscatine County.

When she was seventeen years old, Martinez applied for and obtained an Iowa driver's license. She used a birth certificate in the name of Diana Castaneda, a person with a social security number, to obtain the license. She renewed the license in 2008.

In 2013, Martinez used her fictitious driver's license and a social security card in the same name to obtain employment at Packer Sanitation, a business located in Muscatine County. The documents were used to obtain what is referred to as I-9 paperwork.

---

[1]Memorandum from Janet Napolitano, Sec'y of U.S. Dep't of Homeland Sec. to David L. Aguilar, Acting Comm'r, U.S. Customs & Border Prot.; Alejandro Mayorkas, Dir., U.S. Citizenship & Immigration Servs.; and John Morton, Dir., U.S. Immigration & Customs Enf't (June 15, 2012), http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

Also in 2013, Martinez applied for and received temporary lawful immigration status from the Department of Homeland Security pursuant to the DACA program. Because she now had temporary lawful immigration status, she was able to obtain work authorization in her own name from the Department of Homeland Security.

Because of her lawful status, Martinez was now eligible, under Iowa law, to obtain an Iowa driver's license in her own name. In March 2014, she applied for a license in her own name, using her newly issued social security card.

The Iowa Department of Transportation (IDOT), apparently using facial recognition software, noted a similarity between her photograph taken in 2014 and earlier photographs taken when she obtained her driver's license in 2003 and 2008. As a result, IDOT commenced an investigation.

According to the notes of the IDOT investigator, a woman appeared at the Iowa City drivers' license station on May 2, 2003, with a California birth certificate in the name of Diana Castaneda. She presented two rent receipts as proof of residency in West Liberty. On October 28, 2008, a woman appeared at the Iowa City drivers' license station and applied for an Iowa ID using the name of Diana Castaneda.

On March 6, 2014, a woman appeared at the Iowa City drivers' license station and applied for an Iowa driver's license. The person presented an ID and employment authorization card in the name of Martha Martinez. The photograph of Martinez, however, appeared to match the photograph of Diana Castaneda from March 2, 2003, and October 28, 2008.

The investigator determined that wages were being obtained by Diana Castaneda at Packer Sanitation. The investigator contacted

Packer Sanitation and obtained Diana Castaneda's I-9, copies of her Iowa ID, social security card, and payroll history showing she obtained wages in excess of $1000. The investigator contacted immigration authorities and learned that Martinez had a valid employment authorization card.

The investigator contacted Martinez by phone. Martinez admitted she had obtained the false IDs in 2003 and 2008. She told the investigator she came to the United States as a child and now had three children and was pregnant with a fourth child. She borrowed a birth certificate in the name of Diana Castaneda but did not know her. She had been recently working but had quit due to her pregnancy. She admitted prior employment under the name and social security number of Diana Castaneda. The investigator informed Martinez that he would recommend she be charged with identity theft. The investigator thanked Martinez for being honest and cooperative.

**B. Iowa Criminal Proceedings.** The State filed two criminal charges against Martinez. Count I alleged the crime of identity theft under Iowa Code section 715A.8 (2013). This Code provision states, "A person commits the offense of identity theft if the person fraudulently uses or attempts to fraudulently use identification information of another person, with the intent to obtain credit, property, services, or other benefit." Iowa Code § 715A.8(2). If the value of the credit, property, or services exceeds one thousand dollars, the person commits a class "D" felony. *Id.* § 715A.8(3). If the value of the credit, property, or services does not exceed one thousand dollars, the person commits an aggravated misdemeanor. *Id.* According to the minutes of testimony, the basis for the intent to obtain "credit, property, or services" was employment at Packer Sanitation earning wages in excess of $1000.

Count II alleged the crime of forgery under Iowa Code section 715A.2(1). This Code provision declares that a person is guilty of the crime of forgery if, with intent to defraud or injure anyone, a person "[m]akes, completes, executes, authenticates, issues, or transfers a writing so that it purports to be the act of another who did not authorize that act." *Id.* § 715A.2(1)(*b*). The provision further provides that forgery is a class "D" felony if the writing is or purports to be "[a] document prescribed by statute, rule, or regulation for entry into or as evidence of authorized stay or employment in the United States." *Id.* § 715A.2(2)(*a*)(4).

Martinez filed a motion to dismiss. Citing *Arizona v. United States,* Martinez argued that federal law preempted her prosecution under the Iowa identity theft and forgery statutes, both on their face and as applied. 567 U.S. 387, 415–16, 132 S. Ct. 2492, 2510 (2012). The State resisted. The State distinguished *Arizona,* noting that in that case, the Arizona statute specifically criminalized failure to comply with federal alien registration requirements while the statutes under which Martinez was charged are independent of federal law.

The district court denied the motion to dismiss. According to the court, the charges of identity theft and forgery were "state crimes independent of Defendant's immigration status." In prosecuting Martinez, the court stated, the State was not acting to enforce or attack federal immigration law. Therefore, Martinez's prosecution was not preempted by federal law.

Martinez sought interlocutory review. We granted the application.

**II. Discussion.**

**A. Overview of Federal Immigration Law Related to Unauthorized Employment of Illegal Aliens.**

1. *Introduction.* "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Id.* at 394, 132 S. Ct. at 2498. This broad authority is in part based upon the federal government's power to "establish a[] uniform Rule of Naturalization." *Id.* (quoting U.S. Const. art. I, § 8, cl. 4). It is also based upon the federal government's inherent power as a sovereign to control and conduct relations with foreign governments. *Id.* As demonstrated by an amicus brief in *Arizona* filed by sixteen nations, immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation as well as the perceptions and expectations of aliens on this country who seek full protection of its law. *See* Mot. of Argentina, Bolivia, Brazil, Chile, Colombia, Costa Rica, Dominican Republic, Ecuador, El Salvador, Guatemala, Honduras, Nicaragua, Panama, Paraguay, Peru and Uruguay for Leave to Join the United Mexican States as Amici Curiae in Supp. of Resp't at 6, *Arizona,* 567 U.S. 387, 132 S. Ct. 2492, 2499–2500 (2012). Current national and international debate regarding building a wall on our southern border and the circumstances under which noncitizens from other nations may enter the United States, along with discussions about who should pay for the wall, has an impact on domestic immigration and international relations.

2. *Early regulation and plenary authority.* The United States Supreme Court has observed that the supremacy of national power in the general field of foreign affairs—including immigration, naturalization, and deportation—is made clear by the United States Constitution. *Hines*

*v. Davidowitz*, 312 U.S. 52, 62, 61 S. Ct. 399, 401–02 (1941). Yet, until 1891, no comprehensive immigration legislation existed, and a number of states enacted discriminatory legislation. *See* Kevin J. Fandl, *Putting States Out of the Immigration Law Enforcement Business*, 9 Harv. L. & Pol'y Rev. 529, 530–31 (2015) [hereinafter Fandl]. Responding to discriminatory legislation against Chinese aliens, the United States Supreme Court in *Chy Long v. Freeman*, 92 U.S. 275, 280 (1875), and *Fong Yue Ting v. United States*, 149 U.S. 698, 707, 13 S. Ct. 1016, 1019 (1893), emphasized the need for "absolute and unqualified" power to deport aliens in the interest of national sovereignty. Fandl, 9 Harv. L. & Pol'y Rev. at 531–32 (quoting *Fong Yue Ting*, 149 U.S. at 707, 13 S. Ct. at 1019).

3. *Overview of Immigration and Nationality Act.* Congress exercised its power over immigration through enactment of the Immigration and Nationality Act (INA) which, along with other enactments, provides a "comprehensive federal statutory scheme for regulation of immigration and naturalization" and sets "the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 587, 131 S. Ct. 1968, 1973 (2011) (quoting *De Canas v. Bica*, 424 U.S. 351, 353, 359, 96 S. Ct. 933, 935, 938 (1976), *superseded by statute*, Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, *as recognized in Chamber of Commerce*, 563 U.S. at 590, 131 S. Ct. at 1975); *see* 8 U.S.C. §§ 1101–1537.

By way of brief summary, the INA provides criteria by which "aliens," defined as "any person not a citizen or national of the United States," may enter, visit, and reside in the country. 8 U.S.C. § 1101(a)(3); *see Lozano v. City of Hazelton*, 620 F.3d 170, 196 (3d Cir.

2010), *vacated on other grounds by* 563 U.S. 1030, 131 S. Ct. 2958 (2011). The INA establishes three categories of aliens: (1) nonimmigrants, (2) immigrants, and (3) refugees and asylees. 8 U.S.C. §§ 1101(a)(15), 1151, 1157–58; *see Lozano*, 620 F.3d at 196. In order to be legally admitted to the United States, aliens must meet the eligibility criteria of one of these categories. *Lozano*, 620 F.3d at 196. Certain aliens who have health conditions, have been convicted of certain crimes, present security concerns, or have been recently removed from the United States are inadmissible. 8 U.S.C. § 1182.

Persons in the United States unlawfully are subject to removal, with removal proceedings under the INA setting forth the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." *Id.* § 1229a(a)(3). INA removal procedures provide for notice, the opportunity to be heard, the opportunity to be represented by counsel, and the possibility of discretionary relief from removal including postponement of removal, cancellation of removal, or even adjustment of status to that of lawful permanent residency. *Id.* §§ 1229a(c), 1229b.

4. *Immigration Reform and Control Act.* The INA as originally enacted contained no specific prohibition regarding the employment of aliens which was, as noted by the Supreme Court, at most a "peripheral concern." *De Canas*, 424 U.S. at 360, 96 S. Ct. at 939. That changed, however, with the enactment of the Immigration Reform and Control Act (IRCA) in 1986. *Arizona*, 567 U.S. at 404–05, 132 S. Ct. at 2504; *see* 8 U.S.C. §§ 1324a–1324b. The IRCA established "a comprehensive framework for 'combating the employment of illegal aliens.'" *Arizona*, 567 U.S. at 404, 132 S. Ct. at 2504 (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147, 122 S. Ct. 1275, 1282 (2002)). Under

the IRCA, Congress declared it unlawful to knowingly hire or continue to employ an unauthorized alien without complying with the work authorization verification system created by the statute. 8 U.S.C. § 1324a(a)(1)–(2).

In order to verify work authorization, the employer must attest under penalty of perjury that an employee is not an unauthorized alien by physically examining documents such as a passport, permanent resident card, driver's license, or other comparable document, and confirm that those documents reasonably appear to be genuine. *Id.* § 1324a(b)(1)(A)–(D). On the form known as the I-9, employees must also make an attestation of their authorized work status. *Id.* § 1324a(b)(2).

With respect to the I-9, Congress has provided that "any information contained in or appended to such form, may not be used for purposes other than for enforcement of" the INA and enumerated federal laws regarding false statements, identification-document fraud, fraud in the federal employment verification system, and perjury. *Id.* § 1324a(b)(5). As noted by the United States Supreme Court in *Arizona,* "Congress has made clear . . . that any information employees submit to indicate their work status 'may not be used' for purposes other than prosecution under *specified federal criminal statutes.*" *Arizona,* 567 U.S. at 405, 132 S. Ct. at 2504 (emphasis added) (quoting 8 U.S.C. § 1324a(b)(5)).

Federal employment authorization verification requirements are enforced "through criminal penalties and an escalating series of civil penalties tied to the number of times an employer has violated the provisions." *Id.*; *see* 8 U.S.C. § 1324a(e)–(f). Congress did not authorize criminal penalties for aliens seeking or engaging in unauthorized employment.

Congress authorized imposition of a range of penalties on aliens who commit employment-authorization-related fraud in the IRCA. Congress authorized federal criminal penalties against a person who knowingly uses a document not lawfully issued to the person, a false document, or a false attestation "for the purpose of satisfying a requirement" of the federal employment verification system. 18 U.S.C. § 1546(b). Violators of this criminal provision may be sentenced for up to five years in prison. *Id.* Congress also authorized federal criminal penalties against a person who uses or possesses an immigration document, including one that demonstrates federal work authorization, "knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured . . . by fraud or unlawfully obtained." *Id.* § 1546(a). Persons convicted under this statute, in most cases, may be imprisoned for up to ten years. *Id.* In addition to the criminal penalties, Congress authorized civil penalties for document fraud involving immigration requirements, include the work authorization requirement. 8 U.S.C. § 1324c(a)(1)–(4), (d)(3).

Finally, Congress authorized immigration penalties for persons involved in document fraud. For example, Congress authorized removal of persons convicted of federal criminal document fraud. *Id.* § 1227(a)(3)(B)–(C); *id.* § 1324c; 18 U.S.C. § 1546. Further, federal law may preclude aliens from becoming a lawful permanent resident if the alien was employed while he was an "unauthorized alien." 8 U.S.C. § 1255(c)(2).

5. *Illegal Immigration Reform and Immigrant Responsibility Act.* In 1996, Congress amended the INA by enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104–208, 110 Stat. 3009 (codified as amended in various sections of 8

U.S.C.). The IIRIRA called for improvements in the employer verification system and required that the Attorney General and later the Director of Homeland Security to develop pilot programs designed to improve employment eligibility confirmation process. *See Lozano*, 620 F.3d at 200. Ultimately, only one of the pilot programs, E-Verify, was reauthorized and expanded to all fifty states. *Id.* The use of E-Verify rather than the ordinary I-9 process remains voluntary, with a few exceptions. *Id.*

The IIRIRA authorized the Department of Homeland Security to enter into agreements with state and local law enforcement agencies to enforce federal immigration law. 8 U.S.C. § 1357(g). Under this provision, state and local governments may assist federal enforcement if (1) there is a written agreement, (2) local cooperating authorities receive appropriate training, and (3) local authorities operate under the supervision of federal immigration officials. *Id.*

6. *Federal penalties for immigration document fraud.* The various federal statutes establish a wide range of penalties for document fraud related to immigration. Document fraud in immigration matters is prohibited and subject to an administrative enforcement regime. *Id.* § 1324c. Criminal penalties for fraud and misuse of visas, permits, and other documents are provided in 18 U.S.C. § 1546. In addition, the Identity Theft Penalty Enhancement Act imposes more severe consequences on those who use social security numbers, credit card accounts, or other information in connection with a felony, including violation of immigration law. 18 U.S.C. § 1028A. However, Congress exempted false use of social security numbers for work in certain situations from claims of fraud under the Social Security Act. 42 U.S.C. § 408(e).

7. *Discretion in enforcement of immigration laws.* Under federal immigration laws, discretion is vested in federal officials in two ways. Federal immigration law is replete with statutory provisions explicitly vesting discretion in the executive branch. *See, e.g., Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–84, 119 S. Ct. 936, 943 (1999) (stating in "the initiation or prosecution of various stages in the deportation process . . . [a]t each stage the Executive has discretion to abandon the endeavor").

Congress has also delegated to the executive branch the determination of when a noncitizen may work. 8 U.S.C. § 1324a(h)(3) (removing from definition of "unauthorized alien" those who the Attorney General authorized to be employed even when they are not lawfully admitted for permanent residence). The implementing regulations provide that an alien without lawful status may still be granted work authorization when the administrative convenience gives cases lower priority and an alien establishes economic necessity. 8 C.F.R. § 274a.12(c)(14) (2016).

Further, the United States Supreme Court has "recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S. Ct. 1649, 1655 (1985). In exercising discretion, the United States Supreme Court has recognized that the executive engages in the "balancing of a number of factors which are peculiarly within its expertise." *Id.* As a result, the cases generally recognize that immigration laws vest substantial discretion in the executive branch with respect to enforcement. *See Ariz. Dream Act Coal.*

*v. Brewer*, 855 F.3d 957, 967 (9th Cir. 2017), petition for cert. filed, 85 U.S.L.W. 3471, (U.S. Mar. 29, 2017) (No. 16–1180).

**B. Implementation of Supremacy Clause Through Principles of Preemption.** Under the Supremacy Clause of the United States Constitution, "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Since the days of John Marshall, the Supremacy Clause has been interpreted to mean that even if a state statute is enacted in the execution of acknowledged state powers, state laws that "interfere with, or are contrary to the laws of Congress" must yield to federal law. *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824). The United States Supreme Court has implemented the Supremacy Clause through the development of its preemption doctrine. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152, 102 S. Ct. 3014, 3022 (1982).

The contours of the doctrine of preemption, if sometimes difficult to apply, are well established. The United States Supreme Court has developed two broad categories of preemption of state law: express and implied. *Id.* at 152–53, 102 S. Ct. at 3022. Express preemption occurs when the federal statutory text clearly provides that congressional authority is exclusive. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S. Ct. 1305, 1309 (1977). When express preemption is implicated, close examination of statutory language is ordinarily required to implement congressional intent. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S. Ct. 1732, 1737 (1993).

In addition, the Supreme Court has recognized two types of implied preemption—field preemption and conflict preemption—which arise even when there is no express provision in the federal statute preempting local

law. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. ___, ___, 135 S. Ct. 1591, 1595 (2015). Field preemption arises when Congress has enacted a comprehensive scheme. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–04, 103 S. Ct. 1713, 1722 (1983). In these cases, congressional intent to preempt can be inferred from a framework of regulation "so pervasive . . . that Congress left no room for the States to supplement it" or where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152 (1947).

Conflict preemption occurs when a state law conflicts with a federal provision. *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 605, 111 S. Ct. 2476, 2482 (1991). There are two variations of conflict preemption. Conflict preemption occurs when "compliance with both federal and state regulation is a physical impossibility." *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S. Ct. 1210, 1217 (1963). Conflict preemption also is imminent whenever two separate remedies are brought to bear on the same activity. *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286, 106 S. Ct. 1057, 1061 (1986).

Conflict preemption also occurs when a state law is an obstacle to the accomplishment of a federal purpose. *Hines*, 312 U.S. at 66–67, 61 S. Ct. at 404. In this regard, the United States Supreme Court has said, "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S. Ct. 2288, 2294 (2000).

**C. Application of Preemption Principles to Immigration Law.**

1. *Overview of United States Supreme Court preemption precedent in immigration cases.* In *Hines,* the United States Supreme Court considered the validity of a Pennsylvania alien registration statute. 312 U.S. at 59, 61 S. Ct. at 400. A year earlier, Congress had enacted a Federal Alien Registration Act. *Id.* at 60, 61 S. Ct. at 400. The *Hines* Court noted that "the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, 'the act of [C]ongress . . . is supreme.' " *Id.* at 66, 61 S. Ct. at 403–04 (quoting *Gibbons,* 22 U.S. at 211). The *Hines* Court canvassed the various approaches to preemption, noting that none of the formulations or expressions "provides an infallible constitutional test or an exclusive constitutional yardstick." *Id.* at 67, 61 S. Ct. at 404. And while the federal law did not have an express preemption provision, the *Hines* Court concluded that the Pennsylvania law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*

A more recent immigration case dealing with federal preemption is *De Canas,* 424 U.S. 351, 96 S. Ct. 933. In *De Canas,* the Supreme Court considered whether federal law prohibited California from enacting a statute which forbade an employer from knowingly employing an alien who was not entitled to lawful residence in the United States if such employment would have adverse effect on lawful resident workers. *Id.* at 352–53, 96 S. Ct. at 935. A California appellate court held that the statute was unconstitutional, noting that "in the area of immigration and naturalization, congressional power is exclusive." *De Canas v. Bica,* 115 Cal. Rptr. 444, 446 (Ct. App. 1974). The California court further held that state regulatory power was foreclosed when Congress "as an

incident of national sovereignty" enacted the INA as a comprehensive scheme governing all aspects of immigration and naturalization, including the employment of aliens and specifically declined to adopt sanctions on employers. *Id.*

The *De Canas* Court held that the California statute was not preempted by the INA. 424 U.S. at 365, 96 S. Ct. at 941. The Court concluded preemption could not be required because "the nature of the regulated subject matter permits no other conclusion" nor because "Congress has unmistakably so ordained." *Id.* at 356, 96 S. Ct. at 937 (quoting *Fla. Lime*, 373 U.S. at 142, 83 S. Ct. at 1217). The Court was unwilling to presume that in enacting the INA, Congress intended to oust state authority to regulate the employment of immigrants in a manner consistent with federal law. *Id.* at 357, 96 S. Ct. at 937. The Court declined to consider whether the California statute was "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" because the issue was not addressed below. *Id.* at 363, 96 S. Ct. at 940 (quoting *Hines*, 312 U.S. at 67, 61 S. Ct. at 404). In light of the vibrancy of obstacle preemption in immigration law, *De Canas* thus was a limited precedent from the outset.

In *Hoffman Plastic*, the United States Supreme Court considered whether an unauthorized immigrant could receive back pay when the individual was unlawfully terminated in retaliation for participating in collective bargaining. 535 U.S. at 140, 122 S. Ct. at 1278. In a battle between federal agencies, the Supreme Court held that a National Labor Relations Board remedy for an illegal alien would "unduly trench" upon the IRCA. *Id.* at 151, 122 S. Ct. at 1284. Although not a preemption case, *Hoffman Plastic* declared that "combating the employment of illegal aliens . . . [is] central to '[t]he policy of immigration law.'" *Id.* at 140, 122

S. Ct. at 1278 (quoting *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 194 n.8, 112 S. Ct. 551, 558 n.8 (1991)).

The most recent and most important United States Supreme Court case involving preemption in the context of immigration and employment is *Chamber of Commerce*, 563 U.S. 582, 131 S. Ct. 1968. In *Chamber of Commerce*, the Court considered a challenge to an Arizona law which allowed for the suspension and revocation of business licenses for employing illegal aliens and required all employers to verify the employment status of all employees using an internet-based system, E-Verify. *Id.* at 587, 131 S. Ct. at 1973. Unlike *De Canas*, which involved a preemption claim under the INA, the *Chamber of Commerce* case involved preemption under the IRCA. *Id.* at 588–89, 131 S. Ct. at 1974. The *Chamber of Commerce* Court ruled, however, that the Arizona regulation was within a "savings clause" of the IRCA, which provided that federal immigration law preempts "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ . . . unauthorized aliens." *Id.* at 590, 611, 131 S. Ct. at 1975, 1987 (quoting 8 U.S.C. § 1324a(h)(2)).

The last case is *Arizona*, 567 U.S. 387, 132 S. Ct. 2492. In *Arizona*, the United States challenged four provisions of an Arizona statute dubbed the Support Our Law Enforcement and Safe Neighbor's Act. *Id.* at 393, 132 S. Ct. at 2497. Two of the challenged provisions created new criminal offenses. *Id.* One relevant provision made failure to comply with alien registration requirements a state misdemeanor. *Id.* Another provision made it a misdemeanor for an unauthorized alien to seek or engage in work in the state. *Id.* at 393–94, 132 S. Ct. at 2497–98. Two other provisions gave arrest authority and investigative duties

with respect to certain aliens to state and local law enforcement. *Id.* at 394–95, 132 S. Ct. at 2498.

Justice Kennedy delivered the opinion of the Court. *Id.* at 392, 132 S. Ct. at 2497. Justice Kennedy began with a review of the broad scope of federal immigration policy. *Id.* at 394–97, 132 S. Ct. at 2498–99. Noting the impact of immigration policy on international relations, Justice Kennedy stressed that the federal governance of immigration status is "extensive and complex." *Id.* at 395, 132 S. Ct. at 2499. After canvassing the broad sweep of immigration provisions, Justice Kennedy emphasized that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Id.* Justice Kennedy explained,

> Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service.

*Id.*

Justice Kennedy recognized, however, that states bear "many of the consequences of unlawful immigration." *Id.* at 397, 132 S. Ct. at 2500. Justice Kennedy cited statistics indicating that hundreds of thousands of deportable aliens are captured in Arizona each year. *Id.* Further, Justice Kennedy acknowledged studies reporting that aliens are responsible for a disproportionate share of serious crime. *Id.*

After surveying traditional categories of federal preemption, Justice Kennedy proceeded to evaluate each of the challenged provisions of Arizona law. *Id.* at 397–400, 132 S. Ct. at 2500–01. The first provision considered provided a state criminal penalty for failure to complete or

carry an alien registration document in violation of federal law. *Id.* at 399–400, 132 S. Ct. at 2501. Justice Kennedy wrote that although the statute was not identical to that considered in *Hines*, federal immigration law provides "a full set of standards governing alien registration, including the punishment for noncompliance. It was designed as a 'harmonious whole.'" *Id.* at 401, 132 S. Ct. at 2502 (quoting *Hines*, 312 U.S. at 72, 61 S. Ct. at 407).

According to Justice Kennedy, field preemption foreclosed state regulation even if the state regulation is parallel to federal standards. *Id.* Justice Kennedy emphasized permitting Arizona to impose its own penalties for the federal offenses would conflict with the careful framework Congress adopted. *Id.* If the provision of state law were enforced, Arizona would "have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402, 132 S. Ct. at 2503. Further, Justice Kennedy noted that the penalties for violation of the Arizona law ruled out probation as a possible sentence and eliminated the possibility of a pardon, thus conflicting with the plan that Congress put in place. *Id.*

Justice Kennedy next turned to the provision of Arizona law which made it a state misdemeanor for "an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor." *Id.* (quoting Ariz. Rev. Stat. Ann. § 13–2928(c) (West Supp. 2011)). This Arizona statutory provision had no counterpart in federal law. *Id.* The United States claimed the provision upset "the balance struck by the [IRCA] and must be

preempted as an obstacle to the federal plan of regulation and control." *Id.*

Justice Kennedy recognized that in *De Canas*, the Court had held the federal government had expressed no more than "a peripheral concern with [the] employment of illegal entrants." *Id.* (alteration in original) (quoting *De Canas*, 424 U.S. at 360, 96 S. Ct. at 939). But Justice Kennedy noted that in light of the enactment of the IRCA, "[c]urrent federal law is substantially different from the regime that prevailed when *De Canas* was decided." *Id.* at 404, 132 S. Ct. at 2504. Justice Kennedy noted that IRCA now created "a comprehensive framework" for "combating the employment of illegal aliens." *Id.* (quoting *Hoffman Plastic*, 535 U.S. at 147, 122 S. Ct. at 1282).

In analyzing the comprehensive framework of IRCA, Justice Kennedy stressed that it did not impose criminal sanctions on the employee when aliens sought or engaged in unauthorized work. *Id.* While Justice Kennedy recognized federal law made it a crime for unauthorized workers to obtain employment through fraudulent means, Congress made it clear that any information employees submitted to indicate their work status could not be used for purposes other than "prosecution under specified federal criminal statutes for fraud, perjury, and related conduct." *Id.*; *see* 8 U.S.C. § 1324a(b)(5), (d)(2)(F)–(G).

Justice Kennedy recognized the express exemption provision of IRCA was silent about whether additional penalties could be imposed against employees seeking to engage in unauthorized work. *Id.* But Justice Kennedy emphasized that "the existence of an 'express preemption provisio[n] does *not* bar the ordinary working of conflict preemption principles' or impose a 'special burden' that would make it more difficult to establish the preemption of laws falling outside the

clause." *Arizona*, 567 at 406, 132 S. Ct. at 2504–05 (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869–70, 120 S. Ct. 1913, 1919–20 (2000)).

Justice Kennedy continued that the "Arizona law would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." *Id.* at 406, 132 S. Ct. at 2505. Although the goals and methods of Arizona law to achieve deterrence were the same as federal law, Justice Kennedy observed, the conflict is in "the method of enforcement" and that "[c]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy." *Id.* (quoting *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 287, 91 S. Ct. 1909, 1918 (1971)).

Justice Kennedy next examined the third challenged provision of Arizona law which provided that a state officer, "without a warrant, may arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States." *Id.* (quoting Ariz. Rev. Stat. Ann. § 13-3883(A)(5)). After canvassing federal law related to removal, Justice Kennedy observed the Arizona statute gave state officers even greater authority to arrest aliens on the basis of possible removability than Congress gave to trained federal immigration officers. *Id.* at 408–09, 132 S. Ct. at 2506. The state authority could be exercised without any input from the federal government regarding whether an arrest is warranted in a particular case. *Id.* This, according to Justice Kennedy, "would allow the State to achieve its own immigration policy." *Id.*

Justice Kennedy further reasoned that allowing state authorities to determine whether an alien should be detained for being removable violates the principle that "the removal process is entrusted to the

discretion of the Federal Government." *Id.* Authorizing state and local officials to interfere with this discretion "creates an obstacle to the full purposes and objectives of Congress." *Id.* at 410, 132 S. Ct. at 2507.

Finally, Justice Kennedy turned to the fourth challenged provision of Arizona law. *Id.* This fourth challenged provision required state officers to make a "reasonable attempt" to determine the immigration status of any person they stop or arrest if "reasonable suspicion exists that the person is an alien and is unlawfully present in the United States." *Id.* (quoting Ariz. Rev. Stat. Ann. § 11-1051(B)). Further, the law provided that the immigration status of any person arrested would be determined before release. *Id.* Ordinarily, checking the immigration status of a detained person involved a contact to Immigration and Customs Enforcement (ICE), which keeps a database of immigration records. *Id.*

The Court upheld this provision of Arizona law against preemption attack. *Id.* at 416, 132 S. Ct. at 2510. Justice Kennedy noted that cooperation between federal and state officials is an important part of the immigration system. *Id.* at 411, 132 S. Ct. at 2508. Further, Congress required ICE to respond to requests for verification from state officials. *Id.*

Justice Kennedy closed his opinion with a melodious endorsement of the beneficial aspects of immigration. *Id.* at 415–16, 132 S. Ct. at 2510. He cited an immigration ceremony at the Smithsonian involving a dozen immigrants who stood before the tattered flag that inspired the national anthem. *Id.* He noted the history of the United States "is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here." *Id.*

2. *Application of preemption principles to immigration law by lower federal courts.* After *Arizona*, lower federal courts have grappled with federal preemption questions involving immigrants and employment. The closest precedent to the case before us arises from the state of Arizona.

In *Puente Arizona v. Arpaio*, plaintiffs attacked two Arizona statutes which criminalized the act of identity theft done with intent to obtain or continue employment. 76 F. Supp. 3d 833, 842 (D. Ariz. 2015), *rev'd in part and vacated in part*, 821 F.3d 1098 (9th Cir. 2016). The challenged Arizona aggravated identity theft statute provided that "[a] person commits aggravated taking the identity of another person . . . if the person knowingly takes . . . or uses any personal identifying information . . . of . . . [a]*nother person, including a real or fictitious person, with the intent to obtain employment.*" *Id.* at 844 (quoting Ariz. Rev. Stat. Ann. § 13–2009). Another Arizona statute provided that a person commits identity theft by taking, purchasing, manufacturing, recording, possessing, or using personal identifying information with the intent to engage in an unlawful purpose or to cause economic loss, or "with the intent to obtain or continue employment." *Id.* at 844–45.

The district court granted a preliminary injunction against enforcement of the statutes on preemption grounds. *Id.* at 869. The court recognized that the statutes were facially neutral and applied to immigrants and nonimmigrants alike. *Id.* at 854. The court noted that a state law may not "frustrate the operation of federal law [even if] the state legislature in passing its law had some purpose in mind other than one of frustration." *Id.* at 855 (alteration in original) (quoting *Perez v. Campbell*, 402 U.S. 637, 651–52, 91 S. Ct. 1704, 1712 (1971)). In any event, based on legislative history and common sense, the court

determined that a primary purpose and effect of the statutes was to impose criminal penalties on unauthorized aliens who sought or engaged in unauthorized employment. *Id.*

Turning to preemption analysis, the district court reasoned that in *Arizona*, the Supreme Court did not conclude Congress had occupied the field of "unauthorized-alien employment." *Id.* at 856. Instead, the district court stated the high court applied conflict preemption principles in striking down an Arizona law that made it a crime for unauthorized aliens to seek employment. *Id.*

But in this case, the district court noted, the plaintiffs identified a narrower field, namely, "unauthorized-alien fraud in seeking employment." *Id.* This narrower field, according to the court, "ha[d] been heavily and comprehensively regulated by Congress." *Id.* The court cited extensive regulations in the IRCA, emphasizing that Congress imposed every kind of penalty that can arise from unauthorized alien use of false document to secure employment—criminal, civil, immigration— and had expressly limited states use of federal employment verification documents. *Id.* at 857; *see* 8 U.S.C. § 1324a(b)(5), (d)(2)(F)–(G).

The district court turned to conflict preemption. *Puente Ariz.*, 76 F. Supp. 3d at 857. The court noted that in considering conflict preemption, direct conflict between federal law and state law is not required. *Id.* According to the court, even when state and federal laws have the same general objective, an "inconsistency of sanctions" between two laws may "undermine[] the congressional calibration of force." *Id.* (quoting *Crosby*, 530 U.S. at 380, 120 S. Ct. at 2298). The district court noted that under the Arizona identity theft law, only a criminal sanction was available. *Id.* at 858. In contrast, federal authorities had a range of options, including civil penalties. *Id.*

The district court concluded the overlapping penalties created by the Arizona identity theft statutes which "layer additional penalties atop federal law" likely result in preemption. *Id.* (quoting *Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1267 (11th Cir. 2012)). Like the United States Supreme Court in *Arizona*, the district court noted that conflict is imminent whenever "two separate remedies are brought to bear on the same activity." *Id.* (quoting *Gould Inc.*, 475 U.S. at 286, 106 S. Ct. at 1061). As a result, the court entered a preliminary injunction prohibiting the enforcement of the identity theft statutes. *Id.* at 869.

The United States Court of Appeals for the Ninth Circuit reversed the district court in *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1111 (9th Cir. 2016). The Ninth Circuit reversal, however, was on a narrow ground, namely, that the facially neutral Arizona statutes were not facially preempted. *Id.* at 1108. The Ninth Circuit came to this conclusion because the statutes did not intrude on federal authority in all its applications, as generally required for a successful facial attack. *Id.* at 1107–08. The Ninth Circuit expressed no view as to whether the statutes were preempted on an as-applied basis. *Id.* at 1108.

On remand, the district court considered whether the Arizona statutes were preempted as applied. *Puente Arizona v. Arpaio*, No. CV-14-01356-PHX-DGC, 2016 WL 6873294, at *1 (D. Ariz. Nov. 22, 2016). The court found that Congress preempted "a relatively narrow field: state prosecution of fraud in the I-9 process." *Id.* at *12. In light of the intruding provisions of state identity theft laws, the court concluded the defendants were preempted under field preemption from using the I-9 form and accompanying documentation for investigations or prosecutions of violations of the Arizona identity theft and forgery statutes. *Id.* at *13.

The district court then turned to conflict preemption. *Id.* The court determined the Arizona identity theft and forgery statutes were not conflict preempted. *Id.* at \*15. The court emphasized that federal law only imposed criminal and civil penalties for fraud committed directly in the I-9 process, or to satisfy other immigration requirements or receive other immigration benefits. *Id.* at \*13. But, the court reasoned, to the extent state law imposed penalties on fraud committed outside the I-9 process, the state penalties did not "layer additional consequences on top of federal penalties because the federal penalties [did] not address non-I-9 conduct." *Id.* The court found that use of a false name on an employer's direct deposit payroll form, for example, is not done for an immigration purpose, but rather to obtain the convenience of direct payroll deposits. *Id.* at \*14.

Another case arising out of Arizona dealt with the question of conflict preemption of a state policy refusing to allow DACA recipients to obtain Arizona drivers' licenses. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1057–58 (9th Cir. 2014). In *Brewer*, the Ninth Circuit considered an appeal of a denial of a preliminary injunction restraining the state from enforcing the statute. *Id.* at 1058.

The Ninth Circuit reversed and remanded the matter for entry of a preliminary injunction prohibiting the defendants from enforcing its policy. *Id.* The *Brewer* court declared that the plaintiff's contention that Arizona's policy was conflict preempted because of its interference with Congress's intent that the executive branch possess discretion to determine when citizens work in the United States was plausible. *Id.* at 1061.

The *Brewer* court then turned to the impact of Arizona law on federal policy. *Id.* at 1062. The court reasoned that, as a practical

matter, the ability to drive is a virtual necessity for people in Arizona who want to work. *Id.* The court emphasized it did not matter that the state's policy did not formally prohibit DACA recipients from working, because preemption analysis must contemplate the practical result of the state law. *Id.* The court reasoned that if the practical effect of the Arizona policy "is that DACA recipients in Arizona are generally obstructed from working—despite the Executive's determination, backed by a delegation of Congressional authority, that DACA recipients throughout the United States may work—then the [state's] policy is preempted." *Id.* at 1063. The court emphasized that state law "is preempted whenever its application would frustrate the objectives and purposes of Congress, even if the state law's own application is frustrated by individuals' noncompliance." *Id.* On remand, the district court granted a permanent injunction and the state appealed. *Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 811 (D. Ariz. 2015). The Ninth Circuit affirmed. *Ariz. Dream Act Coal. v. Brewer*, 818 F.3d 901, 920, *amended by* 855 F.3d 957.

Another case involving identity fraud is *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013). In *South Carolina*, the Fourth Circuit considered the validity of a state statute making it unlawful for any person to display or possess a false or counterfeit ID for "purpose[s] of proving lawful presence in the United States." *Id.* at 522. The state argued that a presumption against preemption applied because "fraud is an area traditionally for state legislation." *Id.* at 532. The Fourth Circuit, however, noted that when the fraud at issue involved federal immigration documents, the presumption against preemption did not apply. *Id.* The Fourth Circuit further stressed,

> As with other immigration-related measures, prosecution for counterfeiting or using federal immigration documents is at the discretion of the Department of Justice acting through the United States Attorney, and allowing the state to prosecute individuals for violations of a state law that is highly similar to a federal law strips federal officials of that discretion.

*Id.* at 532–33. Concluding that Congress had occupied the field, the Fourth Circuit noted that because enforcement of federal antifraud statutes involved the discretion of federal officials, a state's own law in the area, inviting state prosecutions, would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines,* 312 U.S. at 67, 61 S. Ct. at 404).

3. *Summary of general principles of preemption in the field of modern immigration law.* There are two general discernable trends in the field of immigration. First, over time, federal regulation of immigration has become increasingly detailed and complex. Second, as noted by one legal expert, the trend in court decisions reflects recognition of broad federal control over nearly the entire field of immigration. Fandl, 9 Harv. L. & Pol'y Rev. at 532.

The expansive scope of federal preemption doctrine in the immigration field recognizes, among other things, the role of discretionary enforcement. Discretion has been baked into the cake of immigration law for many years through congressional enactment and caselaw. State law regulatory schemes that interfere with the systematic implementation of federal enforcement discretion present an obstacle in one of the main purposes of federal immigration policy: to speak with one voice on immigration matters. For this reason, state mirror-image enforcement of federal immigration law was soundly rejected in *Arizona,* 567 U.S. at 410, 132 S. Ct. at 2507.

Finally, through the enactment of 8 U.S.C. § 1357(g), Congress has demonstrated an ability to identify areas of potential federal–state cooperation in the enforcement of immigration law. Notably, however, such federal–state cooperation must be subject to written agreements, involve training of state officials, and be conducted under the supervision of federal authorities. 8 U.S.C. § 1357(g)(1). Even where federal–state cooperation has been expressly authorized, Congress has insisted on substantial federal control of the underlying activities.

**D. Application of Preemption Principles to Iowa's Forgery Statute.** Iowa Code section 715A.2(2)(*a*)(4) is preempted on its face by federal immigration law. The statute provides that forgery arises if the writing is or purports to be "[a] document prescribed by statute, rule, or regulation for entry into or as evidence of authorized stay or employment in the United States." Iowa Code § 715A.2(2)(*a*)(4). This statutory provision is the mirror image of federal immigration law, namely 18 U.S.C. § 1546(a).

Such mirror-image statutes are preempted by federal law. As noted in *Arizona* when the Supreme Court considered state law imposing penalties for federal alien registration violations, "[p]ermitting the State to impose its own penalties . . . would conflict with the careful framework Congress adopted." *Arizona*, 567 U.S. at 402, 132 S. Ct. at 2502. Further, it would impermissibly divest "federal authorities of the exclusive power to prosecute these crimes." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1027 (9th Cir. 2013); *see Ga. Latino All.*, 691 F.3d at 1267 (finding a Georgia statute, which "layer[ed] additional penalties atop federal [immigration] law," preempted). As noted by the United States Supreme Court, under such mirror-image enforcement "the State would have the power to bring criminal charges against individuals for

violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402, 132 S. Ct. at 2503.

**E. Application of Preemption Principles to Prosecution of Martinez Under Iowa's Identity Theft Statute.**

1. *Facial preemption.* Unlike Iowa Code section 715A.2(2)(*a*)(4), Iowa's identity theft statute, Iowa Code section 715A.8, does not directly track the language of federal immigration law. Because the identity theft statute has a potentially broader application outside the immigration context, it is not facially preempted by federal immigration law. An unauthorized alien who committed identity theft outside the field occupied by federal immigration law could be prosecuted under state law. For example, identity theft to defraud a bank by an unauthorized alien would not be preempted by federal immigration law and prosecution of an alien for such a crime would be well within the traditional police power of the states. Further, many persons may be prosecuted under the statute who are not aliens but are United States citizens. While enforcement of identity theft may be preempted by federal immigration law in some contexts, it is only preempted to the extent it intrudes upon, interferes, or is an obstacle to the implementation of federal immigration law. *See Puente Ariz.*, 821 F.3d at 1106.

2. *Field preemption as applied to Martinez.* While the identity theft statute is not preempted in all its applications, that is not the end of the analysis. As noted in *Gade v. National Solid Waste Management Association*, a statute "is not saved from pre-emption simply because the State can demonstrate some additional effect outside of the [preempted area]." 505 U.S. 88, 107, 112 S. Ct. 2374, 2388 (1992). The notion a statute may be preempted in some of its applications was recognized by

the United States Supreme Court in *Hillman v. Maretta*, 569 U.S. \_\_\_, 133 S. Ct. 1943 (2013). In *Hillman,* the Court held that a particular Virginia statute would be preempted only as applied to federal employees. *Id.* at \_\_\_, 133 S. Ct. at 1955. The notion that state statutes may be preempted as applied has been utilized in the immigration law context. *See Brewer,* 757 F.3d at 1062.

We now turn to the question of whether the statute is field preempted as applied in this case. Here, the *only* factual basis for the State's charge that Martinez used false identity documents "to obtain credit, property, and services"—an essential element in the crime of identity theft—is the allegation that Martinez obtained unauthorized employment.

The Iowa identity theft statute is preempted to the extent it regulates fraud committed to allow an unauthorized alien to work in the United States in violation of federal immigration law. The IRCA is a comprehensive statute that brought regulation of alien employment under the umbrella of federal immigration policy. *See Hoffman Plastic,* 535 U.S. at 147, 122 S. Ct. at 1282. Under its comprehensive scheme, Congress made employers primarily responsible for preventing unauthorized aliens from obtaining employment.

To the extent federal immigration authorities choose to proceed with sanctions against unauthorized aliens, the IRCA establishes a comprehensive regime of criminal, civil, and immigration related consequences. *See, e.g.,* 8 U.S.C. § 1324c; 18 U.S.C. § 1546. These multiple sanctions establish a system that can work as a "harmonious whole." *Valle del Sol,* 732 F.3d at 1025. Because the federal immigration law occupies the field regarding the employment of unauthorized aliens, the State in this case cannot prosecute Martinez for identity theft related

to false documentation supplied to her employer as an unauthorized alien. She may, of course, be subject to prosecution under 8 U.S.C. § 1324c and 18 U.S.C. § 1546. Any such prosecution rests in the discretion of federal prosecutors.

The United States Supreme Court's approach in *Arizona* supports our analysis. In *Arizona*, the United States Supreme Court held that the federal plan related to alien registration was "a single integrated and all-embracing system" designed as a "harmonious whole" with a "full set of standards . . . including punishment for noncompliance." 567 U.S. at 400–01, 132 S. Ct. at 2501–02 (quoting *Hines*, 312 U.S. at 72, 74, 61 S. Ct. at 407–08). Here, the same can be said for the field of unauthorized employment of aliens. Congress has dominated the field and because Congress has "adopted a calibrated framework within the INA to address this issue," any "state's attempt to intrude into this area is prohibited." *Ga. Latino All.*, 691 F.3d at 1264. The federal government occupies the field and "even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401, 132 S. Ct. at 2502.

3. *Conflict preemption as applied to Martinez.* We also conclude that enforcement of Iowa's identity theft statute is conflict preempted in this case. Any prosecution under the Iowa identity theft statute frustrates congressional purpose and provides an obstacle to the implementation of federal immigration policy by usurping federal enforcement discretion in the field of unauthorized employment of aliens. *See id.* at 399–400, 132 S. Ct. at 2501. As further noted in *Arizona*, a conflict in technique can be as fully disruptive to the system Congress enacted as conflict in overt policy. *Id.* at 407, 132 S. Ct. at 2505. A state statute is preempted when it stands "as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines*, 312 U.S. at 67, 61 S. Ct. at 404).

Additionally, the full purposes and objectives of Congress in the employment of unlawful immigrants include the establishment of a comprehensive federal system of control with a unified discretionary enforcement regime. As noted in *South Carolina*, it is the prerogative of federal officials to police work authorization fraud by aliens. 720 F.3d at 533. Federal discretion in the enforcement of immigration law is essential to its implementation as a harmonious whole. The reasons for exercise of federal discretion are varied. Federal officials often rely upon unauthorized aliens to build criminal cases involving drugs or human traffickers. The risk faced by unauthorized aliens being subject to violations of labor laws by exploiting employers is a discretionary factor to be taken into account by federal officials. *Arizona*, 567 U.S. at 404–05, 132 S. Ct. at 2504. Enforcement may be affected by foreign affairs or a need to account for reciprocal enforcement in other countries. *Id.* at 395, 132 S. Ct. at 2498. As Justice Kennedy noted in *Arizona*, "Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than . . . aliens who commit a serious crime." *Id.* at 396, 132 S. Ct. at 2499.

Local enforcement of laws regulating employment of unauthorized aliens would result in a patchwork of inconsistent enforcement that would undermine the harmonious whole of national immigration law. This case is a classic demonstration of why preemption is necessary. Federal authorities in this case appear to be willing to defer any potential federal immigration action on equitable and humanitarian grounds. Martinez came to the United States as a child, an illegal entry for which

she is not personally responsible. She was educated in Iowa, has no criminal record, is a productive member of the community, and now has four children who are citizens of the United States. Federal immigration authorities routinely take these equitable and humanitarian considerations into account in the enforcement of immigration law. Federal enforcement officials might well weigh the fact that a mother would be separated from her four children who are United States citizens as a very undesirable result.

Further, Martinez stepped forward as part of a federal program, DACA. She provided relevant immigration authorities with information and was granted deferred status. Federal authorities might blanch at prosecuting a person who in good faith responded to their invitation to come out of the shadows for deferred action. *See Brewer*, 757 F.3d at 1063 (citing the practical effect of Arizona policy being DACA recipients were barred from working).

The state prosecutor in this case, however, seems to have a different philosophy and, as reflected in the charging decision to seek Martinez's conviction on two felonies, exposed her to a significant Iowa prison term and removal from the country. If such local exercise of prosecutorial discretion were permitted, the harmonious system of federal immigration law related to unauthorized employment would literally be destroyed.

Allowing Iowa to enforce its identity theft statute in the context of the employment of an unauthorized alien conflicts with Congress's chosen method of enforcement. *See Arizona*, 567 U.S. at 406–07, 132 S. Ct. at 2505. Federal prosecution of immigration crimes are brought by the appropriate United States Attorney. United States Attorneys exercise their discretion in a manner consistent with the established

priorities of the administrations they serve. *Ga. Latino All.*, 691 F.3d at 1265. Although federal law allows state–federal cooperative enforcement by agreement under certain circumstances, there is no applicable agreement here. *See* 8 U.S.C. § 1357(g)(1). Allowing state prosecutors to pursue identity theft criminal prosecutions in which the crimes are based on unlawful employment by unauthorized aliens would threaten uniform application of immigration law. *See Ga. Latino All.,* 691 F.3d at 1266.

### III.  Conclusion.

For the above reasons, we reverse the decision of the district court and remand the case for entry of an order of dismissal.

**REVERSED AND REMANDED WITH DIRECTIONS.**

Cady, C.J., Wiggins and Hecht, JJ., join this opinion. Cady, C.J., files a special concurrence in which Wiggins, J., joins. Wiggins, J., files a separate special concurrence. Mansfield, Waterman, and Zager, JJ., dissent.

**CADY**, **Chief Justice (concurring specially).**

I join the opinion of the court. I write separately to elaborate on the principles it expresses.

The State uses two criminal laws to prosecute Martha Martinez. One is the crime of identity theft. The other is the crime of forgery. The question is whether the prosecution of an unauthorized alien for these crimes in the manner pursued in this case violates the federal preemption doctrine.

Without question the authority to regulate immigration is "exclusively a federal power." *De Canas v. Bica*, 424 U.S. 351, 354, 96 S. Ct. 933, 936 (1976). Moreover, under the Immigration Reform and Control Act, Congress has clearly decided not to impose criminal penalties on aliens who seek or engage in unauthorized employment. *Arizona v. United States*, 567 U.S. 387, 406, 132 S. Ct. 2492, 2505 (2012). Any state law contrary to this approach is an impediment to the regulatory power of Congress and contrary to the Supremacy Clause of the United States Constitution. *See id.* Thus, no state may impose criminal penalties on unauthorized employees.

The crime of identity theft does not conflict with the federal preemption doctrine on its face. It criminalizes the fraudulent use of identification information of another "with intent to obtain credit, property, services, or other benefits." Iowa Code § 715A.8(2) (2013). This crime is elevated from an aggravated misdemeanor to a felony when the value of the credit, property, services, or other benefit obtained exceeds $1000. *Id.* § 715A.8(3). Identity theft is a serious crime, and states are normally free to prosecute violators, whether citizens or aliens.

Yet, the State in this case has not just prosecuted an unauthorized alien for using false information, but has prosecuted the unauthorized alien for using the false information to obtain employment and to earn wages from that employment. Consequently, the State has used the law in a way to criminalize the conduct of an unauthorized alien who applied for and obtained a job with false identification and earned wages from the job. While the State could use the crime to prosecute an unauthorized alien for a variety of conduct related to identity theft, the conduct here is tied to a narrow area controlled by Congress.

It is important to observe that the United States of America is bound together by shared constitutional values. These national values are protected by the preemption doctrine from state laws that directly contravene them, just as they are protected from state laws that would work against them in less obvious ways. Courts have played a critical role in seeing through state laws that may appear neutral and benign on their face, but work subtly or indirectly to violate a fundamental precept of our Federal Constitution. This has been observed in a variety of areas. For example, courts have been vigilant to strike down state laws that indirectly interfere with the right to vote, just as they would with state laws that would attempt to do so directly. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668–69, 86 S. Ct. 1079, 1082 (1966). Likewise, in the area of discrimination, the Court has long held,

> Though the [state] law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.

*Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S. Ct. 1064, 1073 (1886). Simply put, "The Constitution does not make judicial observance or enforcement of its basic guaranties depend on whether their violation appears from the face of legislation or only from its application to proven facts." *Yakus v. United States*, 321 U.S. 414, 484, 64 S. Ct. 660, 696 (1944) (Rutledge, J., dissenting).

In this case, the crime requires the job applicant to secure employment and begin earning wages in order to satisfy the criminal element of value. *See* Iowa Code § 715A.8(3). The State argues the law is permissibly intended to protect potential victims of identity theft, but "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Free v. Bland*, 369 U.S. 663, 666, 82 S. Ct. 1089, 1092 (1962); *see also Henderson v. Mayor of N.Y.*, 92 U.S. 259, 272 (1875) ("[N]o definition of [the state police power], and no urgency for its use, can authorize a State to exercise it in regard to a subject-matter which has been confided exclusively to the discretion of Congress by the Constitution.").

The identity theft law may not specifically target unauthorized workers or be the full frontal assault on the employment of unauthorized aliens found prohibited in *Arizona*, 567 U.S. at 406–07, 132 S. Ct. at 2505, but the outcome, nevertheless, is not saved from the doctrine of federal preemption. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105, 112 S. Ct. 2374, 2386–87 (1992) ("Although 'part of the pre-empted field is defined by reference to the purpose of the state law in question, . . . another part of the field is defined by the state law's actual effect.'" (alteration in original) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 84, 110 S. Ct. 2270, 2278 (1990)). As applied to unauthorized aliens who use identification information in seeking employment, the law

interferes with the efforts of Congress to regulate matters governing unauthorized alien employees every bit as it interfered in *Arizona.*

The crime of forgery as used in this case also violates the preemption doctrine. This result is only more obvious. The holding in *Arizona* discussing a state alien registration statute needs only a few words changed to illustrate the conflict with the preemption doctrine in this case:

> [Iowa] contends that [Iowa Code section 715A.2(2)(*a*)(4)] can survive preemption because the provision has the same aim as federal law and adopts its substantive standards. This argument not only ignores the basic premise of field preemption—that States may not enter, in any respect, an area the Federal Government has reserved for itself—but also is unpersuasive on its own terms. Permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted.

*Arizona,* 567 U.S. at 402, 132 S. Ct. at 2502. By imposing state criminal penalties for "forgery . . . to [obtain] employment" on top of the existing federal system regulating the employment of aliens, Iowa Code section 715A.2(2)(*a*)(4) robs the federal government of the discretion it has so carefully reserved. It may not do so. That discretion, ever decreasing in its availability, *see Padilla v. Kentucky,* 559 U.S. 356, 363–64, 130 S. Ct. 1473, 1480 (2010), is crucial to the federal scheme. *See Arizona,* 567 U.S. at 396, 132 S. Ct. at 2499 ("Discretion in the enforcement of immigration law embraces immediate human concerns."); Gabriel J. Chin & Marc L. Miller, *Broken Mirror: The Unconstitutional Foundations of New State Immigration Enforcement,* in *Strange Neighbors: The Role of States in Immigration Policy* 167, 170 (Carissa Byrne Hessick & Gabriel J. Chin, eds. 2014) ("[T]he *discretion* inherent in the federal immigration regime, and in federal criminal enforcement more generally—the power to charge or not, to decide what to charge, and to choose whether to pursue civil or

administrative measures—is itself a fundamental part of the *law* of immigration."). State authority is limited by "the scope of [its] police powers." *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146, 83 S. Ct. 1210, 1219 (1963). No definition of the State of Iowa's police powers would authorize it to regulate immigration. *See Henderson*, 92 U.S. at 272.

These state laws, whether by design or effect, have intruded in an area wholly occupied by the federal government. They are therefore preempted by Article VI, Clause 2 of the U.S. Constitution.

Wiggins, J., joins this special concurrence.

#15–0671, *State v. Martinez*

**WIGGINS, Justice (specially concurring).**

I join the majority opinion and write separately to emphasize the issue of prosecutorial discretion.

Martha Aracely Martinez was born in Mexico. Her parents brought her to Muscatine, Iowa, when she was eleven years old. It was not her choice to come here. Since then, she has lived in Muscatine, attended local schools, and worked in the community. When her parents brought her to the United States, she did not have a lawful immigration status. Because she had no immigration status, she could not lawfully obtain a driver's license or lawful employment when she became old enough to do so.

When she was seventeen years old, Martinez used fictitious documents to acquire an Iowa driver's license, which in turn, she used to obtain employment. She was a model citizen, contributing member of the community, and employed for thirteen years. After Deferred Action for Childhood Arrivals (DACA)[2] protection coaxed Martinez from the shadow of deportation to acquire lawful immigration status and work authorization, the Muscatine County Attorney charged her with crimes for previously using the fictitious documents to obtain a license and employment. Importantly, there is nothing in the record to indicate that her use of the fictitious documents caused anyone harm.

As Martinez approached adulthood, she had to figure out a way to survive in a country her parents brought her to as a child. This country

---

[2]Memorandum from Janet Napolitano, Sec'y of U.S. Dep't of Homeland Sec. to David L. Aguilar, Acting Comm'r, U.S. Customs & Border Prot.; Alejandro Mayorkas, Dir., U.S. Citizenship & Immigration Servs.; and John Morton, Dir., U.S. Immigration & Customs Enf't (June 15, 2012), http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

is the only country she knew. She chose to support herself and her children by participating in the legal economy. She did not have any other good choices. One bad choice would be to support herself and her family by engaging in illegal activities. Another would be to support herself by participating in the underground economy. If she did get involved in either the illegal or the underground economy, she could have become a victim of human trafficking. *See* Dina Francesca Haynes, *Exploitation Nation: The Thin and Grey Legal Lines Between Trafficked Persons and Abused Migrant Laborers*, 23 Notre Dame J.L. Ethics & Pub. Pol'y 1, 44–45 (2009). Yet, another choice would be to return to a country that was never her home.

When DACA became available, Martinez came forward to obtain legal immigration status and proper work authorization. At each step, it seems, Martinez attempted to do right in difficult circumstances created by her parents when she was only a child. According to the record and by all measures, Martinez has been a valuable contributor to her community and our state. At the time the county attorney decided to exercise his discretion to file charges, she had three young children and was pregnant with her fourth child. At the time he filed the charges, the county attorney knew there was a good chance Martinez could be deported, which would force her children, three American citizens, to leave the country or stay here and fend on their own.

The county attorney "is an administrator of justice, an advocate, and an officer of the court." ABA Standards for Criminal Justice: Prosecution Function and Defense Function 3-1.2(b), at 4 (3d ed. 1993) [hereinafter ABA Standards]. As Judge Weinstein noted over thirty years ago,

> [a]ny ethical and procedural obligation of a private attorney to be fair to opponents and candid with the court is enforceable when the litigant is represented by an attorney for the government. As a United States Attorney General put it more than a hundred years ago, "in the performance of . . . his duty . . . he is not a counsel giving advice to the government as his client, but a public officer, acting judicially, under all the solemn responsibilities of conscience and legal obligations."

*Zimmerman v. Schweiker*, 575 F. Supp. 1436, 1440 (E.D.N.Y. 1983) (quoting Office & Duties of Att'y Gen. 6 Op. Att'y Gen. 326, 334 (1854)).

Further, the county attorney "must exercise sound discretion in the performance of his or her functions." ABA Standards 3-1.2(b), at 4. As an administrator of justice, the county attorney has significant power, and with it, must use appropriate restraint. The county attorney has a duty to "seek justice, not merely convict." *Id.* 3-1.2(c), at 4.

Ultimately, however, Congress vests the United States government with the discretion to prosecute persons in similar situations as Martinez, not the ninety-nine local county attorneys in our state. It is up to the United States government to exercise its discretion appropriately and seek justice.

**MANSFIELD, Justice (dissenting).**

I respectfully dissent.

The court has established an exemption from generally applicable Iowa law for the exclusive benefit of unauthorized aliens seeking employment in our state. Under the majority's ruling, an American citizen who works in Iowa under a false name because she is being chased by a bill collector and wants to avoid garnishment can be prosecuted, but a foreign national who works in Iowa under a false name to avoid detection is immune. That is the wrong reading of federal preemption.

The correct reading comes from the district court, which denied Martha Martinez's motion to dismiss and provided the following straightforward explanation:

> [I]dentity theft and forgery are state crimes independent of the Defendant's immigration status. In this prosecution, the State takes no action to enforce or attack [the Immigration Reform and Control Act]. The State's sole interest is the protection of citizens from identity theft and to protect employers from persons who apply for employment under false names and forge signatures of the names of persons whose identities they have stolen.

I agree with the district court's reasoning and would affirm.

Although the majority tries to justify its decision based on field preemption and conflict preemption, neither doctrine can sustain its ruling. In the critical part of the majority opinion (i.e., the end of it where the actual legal analysis occurs), my colleagues quote cases out of context and paraphrase cases as saying things they don't actually say.

Let me give one example from field preemption and another from conflict preemption. The majority today concludes that Congress has occupied the field of employment of unauthorized aliens, thus precluding

the states from enforcing their generally applicable laws, such as identity theft. I am unaware of any other court that has so held. From reading Part II.E.2 of the court's opinion, though, one might get the impression that *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012), found field preemption as to employment of unauthorized aliens and therefore supports today's decision.

One would be wrong. *Georgia Latino* actually found that Congress had occupied the field of unlawful transport and movement of aliens— not employment. *Ga. Latino*, 691 F.3d at 1264. That's a big difference.

Turning to conflict preemption, in Part II.E.3 the court cites and relies upon *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013). The court asserts that this case holds "it is the prerogative of federal officials to police work authorization fraud by aliens." But *South Carolina* says no such thing. The state-law crime there involved displaying or possessing false documents "for the purpose of proving lawful presence in the United States." *Id.* at 532. Presence in the United States, naturally, is a particular concern of the government of the United States. That isn't what this case is about. It is about using a false Iowa identification card to obtain employment from an Iowa employer.

To put today's decision into context, it is helpful to compare it to a recent decision of the United States Court of Appeals for the Ninth Circuit. Recently, the Ninth Circuit held that Arizona's policy of denying drivers' licenses to all persons protected by the Obama Administration's Deferred Action for Childhood Arrivals (DACA) program was preempted by federal law. *See Ariz. Dream Act Coal. v. Brewer*, 818 F.3d 901, 917 (9th Cir. 2016), *amended by* 855 F.3d 957 (9th Cir. 2017), *petition for cert. filed*, 85 U.S.L.W. 3471 (U.S. Mar. 29, 2017) (No. 16–1180). This has sparked disagreement. Dissenting from the denial of rehearing en

banc, six judges of that court noted that DACA had not been approved by Congress but was just the President's "commitment not to deport." *Ariz. Dream Act Coal.,* 855 F.3d at 958 (Kozinski, J., dissenting from the denial of rehearing en banc). They asked, "Does the Supremacy Clause nevertheless force Arizona to issue drivers' licenses to the recipients of the President's largesse?" *Id.* They characterized the Ninth Circuit panel opinion as relying on a "puzzling new preemption theory." *Id.*

Today's decision goes much farther than that "puzzling" Ninth Circuit decision. Instead of giving the benefits of preemption to people whom the Obama Administration *affirmatively exercised its discretion to protect,* as the Ninth Circuit did in *Arizona Dream Act Coalition,* the court today gives the benefits of preemption to someone on whose behalf the Obama Administration *declined to exercise its discretion*—namely, a person who has committed identity fraud and forgery.

In order to be eligible for deferred status under DACA, an individual must not have been convicted of any felony offense (or misdemeanor punishable by more than one year in prison) in the United States. *See* Memorandum from Janet Napolitano, Sec'y of U.S. Dep't of Homeland Sec. to David L. Aguilar, Acting Comm'r, U.S. Customs & Border Prot.; Alejandro Mayorkas, Dir., U.S. Citizenship & Immigration Servs.; and John Morton, Dir., U.S. Immigration & Customs Enf't (June 15, 2012), http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf. According to the Department of Homeland Security's website, any conviction under federal, state, *or* local law qualifies, and only "[i]mmigration-related offenses" are excluded. *See* U.S. Citizenship & Immigration Servs., Dep't of Homeland Sec., DACA Toolkit, p. 23-24, https://www.uscis.gov/sites/default/files/USCIS/Humanitari

an/Deferred%20Action%20for%20Childhood%20Arrivals/DACA-toolkit.
pdf (last visited June 2, 2017).

Thus, under DACA, state-law convictions for identity theft or forgery are disqualifying. Yet if the Department of Homeland Security did not believe state-law identity theft or forgery charges should prevent an unauthorized alien who arrived as a child from remaining in this country, it could have easily so provided in DACA. It did not. The court thus constructs a preemption theory today on behalf of someone whom the federal executive branch exercised its discretion to decline to protect.

Let me make the same point a different way. Since "federal discretion" appears to be the core basis for the court's preemption decision, one would expect the court to cite *some* statement, from *some* federal official, in *some* administration expressing the view that states should not prosecute identity theft and forgery by unauthorized aliens seeking employment. That might demonstrate that Iowa was doing something at odds with federal law enforcement. But the court cites no such statement.

Simply stated, the majority's approach is not preemption under any cognizable legal doctrine. It is not field preemption. It is not conflict preemption. It is, at best, gestalt preemption.[3]

**I. Today's Decision Is Contrary to Precedent, Including Decisions of the United States Court of Appeals for the Ninth Circuit and Appellate Courts in Kansas and Missouri.**

Five years ago, in *Arizona v. United States*, the Supreme Court found that several provisions of a recently enacted Arizona law (S.B.

---

[3]In explaining the court's theory of preemption, the first special concurrence analogizes this case to "state laws that indirectly interfere with the right to vote." Such an analogy is off the mark. Citizens have a constitutional right to vote. Unauthorized aliens do not have a constitutional right to work in the United States under a false name.

1070) were preempted by federal immigration law. *See* 567 U.S. 387, 415, 132 S. Ct. 2492, 2510 (2012). The stated purpose of S.B. 1070 was to "discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States." *Id.* at 393, 132 S. Ct. at 2497 (quoting note following Ariz. Rev. Stat. Ann. § 11–1051 (West 2012)). Two of the four challenged provisions of S.B. 1070 warrant discussion here. Section 3 set forth a new state law misdemeanor consisting of the "willful failure to complete or carry an alien registration document . . . in violation of 8 United States Code § 1304(e) or 1306(a)." *Id.* at 400, 132 S. Ct. at 2501 (quoting Ariz. Rev. Stat. Ann. § 11–1509(A) (West Supp. 2011)). Section 5(C) made it a state law misdemeanor for "an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor" in Arizona. *Id.* at 403, 132 S. Ct. at 2503 (quoting Ariz. Rev. Stat. Ann. § 13–2928(C)).

The Court found that section 3 was subject to field preemption. *Id.* at 403, 132 S. Ct. at 2503. The Court noted that federal law related to alien registration provided a "full set of standards" and was designed as a "harmonious whole." *Id.* at 401, 132 S. Ct. at 2502 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72, 61 S. Ct. 399, 407 (1941)). The federal framework also included criminal punishment for noncompliance. *See* 8 U.S.C. §§ 1304(e), 1306(a) (2012). Accordingly, the Court determined the federal government had completely "occupied the field of alien registration." *Id.* at 401, 132 S. Ct. at 2502.

The Court continued, "Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible." *Id.* Thus, even though Section 3 only criminalized activity that was already a federal crime, the federal

government's occupation of the field of alien registration meant that Arizona "may not enter, in any respect," that field. *Id.* at 402, 132 S. Ct. at 2502 ("Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards.").[4]

As to section 5(C) of S.B. 1070, the federal government argued conflict preemption, and the Court agreed. *Id.* at 403, 407, 132 S. Ct. at 2503, 2505. As the Court explained, persons who violate provisions of the Immigration Reform and Control Act of 1986 (IRCA) by engaging in unauthorized employment are subject to civil penalties, such as losing their eligibility to have permanent status adjusted, or being removed from the country. *Id.* at 404–05, 132 S. Ct. at 2504 (discussing 8 U.S.C. §§ 1255(c), 1227(a)(1)). However, the IRCA does not "impose federal criminal sanctions on the employee side." *Id.* In the Court's view, Congress made a "deliberate choice" not to impose criminal penalties on persons who merely seek or engage in unauthorized employment. *Id.* "Although § 5(C) attempts to achieve one of the same goals as federal law—the deterrence of unlawful employment—it involves a conflict in the method of enforcement." *Id.* at 406, 132 S. Ct. at 2505.

The Court therefore determined that section 5(C) "interfere[s] with the careful balance struck by Congress with respect to unauthorized employment of aliens." *Id.* The Court found that section 5(C) was

---

[4]The first special concurrence conflates this part of the Supreme Court's decision with the part dealing with employment of unauthorized aliens. Specifically, to support its claim of field preemption, the first special concurrence provides a block quotation from the Court's discussion of section 3 of S.B. 1070, urging that this "holding . . . needs only a few words changed to illustrate the conflict with the preemption doctrine in this case." But the *Arizona* language in question relates to alien *registration*, not alien *employment*, and thus has nothing to do with the present case. *See* 567 U.S. at 401, 132 S. Ct. at 2502.

preempted by federal law because it was "inconsistent with federal policy and objectives" and "an obstacle to the regulatory system Congress chose." *Id.* at 405–06, 132 S. Ct. at 2504–05.

Our case involves neither of the two situations identified in *Arizona.* The State is not attempting to prosecute either (1) a failure to comply with alien registration or (2) a mere attempt by an unauthorized alien to secure employment. The present case involves, rather, the use of a false Iowa identification to obtain the benefit of employment in Iowa.[5]

Since *Arizona* was decided, three reported appellate cases, one federal and two state, have addressed our situation. None of them agrees with today's ruling.

In *Puente Arizona v. Arpaio,* the plaintiffs mounted a facial challenge to two Arizona identity theft laws as preempted by the IRCA. *See* 821 F.3d 1098, 1102 (9th Cir. 2016). The first statute prohibited "using the information of another (real or fictitious) person 'with the intent to obtain employment.'" *Id.* (quoting Ariz. Rev. Stat. § 13–2009). The second statute was an expansion on the general identity theft statute, enacted in order to "also reach employment-related identity theft." *Id.* The Ninth Circuit applied a presumption *against* preemption, reasoning that "while the identity theft laws certainly have effects in the area of immigration, the text of the laws regulate for the health and safety of the people of Arizona." *Id.* at 1104.

The Ninth Circuit thus concluded that neither statute was field or conflict preempted on its face by the IRCA. *Id.* In so holding, the court

[5]The first special concurrence relies on *Arizona* for the proposition that "no state may impose criminal penalties on unauthorized employees." As I have explained, that is not a holding of the case. Rather, *Arizona* holds that states may not criminalize *the mere act of seeking or holding employment by an unauthorized alien. Id.* at 406–09, 132 S. Ct. at 2505–06. The Iowa laws at issue do not do this.

emphasized that "the identity theft laws are textually neutral—that is, they apply to unauthorized aliens, authorized aliens, and U.S. citizens alike." *Id.* at 1105. In other words, "one could not tell that the identity theft laws undermine federal immigration policy by looking at the text itself." *Id.* Because the statutes at issue "make it a crime for '*any person*' to use a false document to gain employment," the court said that cases like *Arizona* are "easily distinguishable" and "do not control here." *Id.* at 1107 (emphasis added).

As a result, the court instead focused on the effect of the statutes to determine "if the state encroached on an area Congress intended to reserve." *Id.* at 1106. Considering the statutes were generally applicable to any person who uses another's identity for any reason—immigration or nonimmigration—the court reasoned,

> Congress could not have intended to preempt the state from sanctioning crimes that protect citizens of the state under Arizona's traditional police powers without intruding on federal immigration policy. Thus, we hold that despite the state legislative history, Congress did not intend to preempt state criminal statutes like the identity theft laws.

*Id.* The court emphasized that this was not a case where "the statutory language singles out unauthorized aliens." *Id.* at 1107.

After the Ninth Circuit weighed in and rejected the facial challenge, the *Puente Arizona* litigation continued in district court. On November 22, 2016, in ruling on cross-motions for summary judgment, the district court held that Arizona's laws criminalizing identity theft for purposes of obtaining employment were not preempted as applied for the most part. *Puente Ariz. v. Arpaio*, No. CV–14–01356–PHX–DGC, 2016 WL 6873294, at *10–11, *16 (D. Ariz. Nov. 22, 2016). The court excepted only the approximately 10 percent of cases where the state had used the Form I-9 and attached documents to investigate or prosecute the case. *See id.* at

*12–13.[6]

Last year, in *State v. Ochoa-Lara*, the Kansas Court of Appeals held that a state prosecution of identity theft, based on the unlawful use of another's social security number to gain employment, was not preempted by the IRCA. 362 P.3d 606, 612 (Kan. Ct. App. 2016), *review granted* (Oct. 21, 2016). The court emphasized that the laws in question were neutrally worded and prohibited using the personal identification of another with the intent to defraud in order to receive a benefit. *Id.* at 611. The court recognized "Kansas' historic police power to prosecute identity thieves." *Id.* The court concluded that "the possible illegal uses of another's Social Security number are myriad" and "[t]here is nothing in the IRCA that suggests that Congress intended the comprehensive preemption of the police powers of the State to prosecute all such instances of identity theft." *Id.* at 612.

Likewise, in *State v. Diaz-Rey*, the Missouri Court of Appeals rejected a preemption defense to a forgery charge based on the use of a false social security card to obtain employment. 397 S.W.3d 5, 10 (Mo. Ct. App. 2013). In finding the law not subject to field preemption, the court reasoned that it was

> a state law of general applicability that uniformly applies to all persons as members of the general public, and makes no distinction between aliens and non-aliens. As a general matter, such laws are not preempted simply because a class of persons subject to federal regulation may be affected.

*Id.* at 9. The court also concluded that conflict preemption did not apply because

> [u]nlike section 5(C) of the *Arizona* statute, section 570.090 does not criminalize activity that Congress has

---

[6]I discuss the I-9 exemption below.

decided not to criminalize. Rather, as charged in this case, it criminalizes the use of inauthentic writings or items as genuine with knowledge and intent to defraud. Thus, section 570.090 does not stand as an obstacle to Congress's purpose in enacting IRCA.

*Id.* at 10 (citation omitted).

In this case, the State charged Martinez with forgery and identity theft in violation of Iowa Code sections 715A.2(1)(*c*) and 715A.8(2) (2013). Both charges stemmed from Martinez's use of Diana Castaneda's identity to work at Packers Sanitation. Because Martinez had used the Castaneda documents to secure employment, the forgery charge was elevated to a class "D" felony. *See id.* § 715A.2(2)(*a*)(4). Furthermore, the identity theft charge was treated as a class "D" felony because earnings statements from Packers Sanitation indicated Martinez had been paid more than $1000 from January to June 2013. *See id.* § 715A.8(3).

Like the statutes at issue in the Kansas and Missouri cases, both *misdemeanor* forgery under Iowa Code section 715A.2 and identity theft under Iowa Code section 715A.8 are broad-based, neutral laws. They cover certain categories of fraudulent conduct and operate in an area of traditional state police power. For example, the earliest Iowa Codes would have criminalized the conduct that Martinez was alleged to have engaged in here. *See* Iowa Code § 2627 (1851) (relating to uttering forged instruments).

Notably, our nation has no federal identity card. Driver's licenses and nonoperator identification cards are an area of traditional state concern. *See Koterba v. Commonwealth*, 736 A.2d 761, 765 (Pa. Commw. Ct. 1999) ("[T]he issuance [and denial] of driver's licenses is a function traditionally exercised by the individual state governments." (Second alteration in original.)). Iowa has a legitimate state interest in the integrity of its own state-issued forms of identification and avoiding their

misuse.   There is no indication in the IRCA or elsewhere that state prosecutions for use of false state identity documents would undermine a congressional objective such that persons who use those documents to obtain work should receive a "hands off" from state criminal law.

**II. Express Preemption Based on 8 U.S.C. § 1324a(b)(5) Does Not Apply Here.**

When Martinez began working at Packers Sanitation, she completed a Form I-9, titled "Employment Eligibility Verification."   At that time, Martinez provided the Iowa identification card in Diana Castaneda's name but bearing Martinez's photo as well as the social security card in Castaneda's name.   Copies of these documents were retained by the employer and obtained by DOT in their investigation. Federal law provides with respect to the I-9,

> Limitation on use of attestation form
>
> A form designated or established by the Attorney General under this subsection [the I-9] and any information contained in or appended to such form, may not be used for purposes other than for enforcement of this chapter and sections 1001, 1028, 1546, and 1621 of Title 18.

8 U.S.C. § 1324a(b)(5).

This language clearly prohibits a state prosecution based on false statements within the I-9 form itself.   However, two courts have read the language as not foreclosing state prosecutions for the display of false documents when the I-9 is completed, even if the employer retains copies of the false documents and attaches them to the I-9.   In *State v. Reynua*, the Minnesota Court of Appeals decided that a state perjury prosecution based on false statements on an I-9 was preempted but declined to find preemption of a simple-forgery charge due to presentation of a false Minnesota identification card.   *See* 807 N.W.2d 473, 480–81 (Minn. Ct. App. 2011).   The court concluded, "[W]e cannot read this provision so

broadly as to preempt a state from enforcing its laws relating to its own identification documents." *Id.* The court reasoned,

> [Section 1324a(b)(5)] does not exhibit a "clear and manifest purpose" to bar enforcement of state laws pertaining to state identification cards. It would be a significant limitation on state powers to preempt prosecution of state laws prohibiting falsification of state-issued identification cards, let alone to prohibit all use of such cards merely because they are also used to support the federal employment-verification application.

*Id.* at 481 (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77, 129 S. Ct. 538, 543 (2008)). In *Ochoa-Lara*, the Kansas Court of Appeals endorsed this analysis. *See* 362 P.3d at 610–11.

The United States District Court for the District of Arizona has read the scope of the prohibition more broadly. It found that 8 U.S.C. § 1324a(b)(5) bars investigatory use, not merely evidentiary use, of the I-9 and attachments in prosecutions other than for the listed federal crimes. *Puente Ariz.*, 2016 WL 6873294, at *12–13. Hence, the court found that the state was "field preempted from using the Form I-9 and accompanying documents for investigations or prosecutions of violations of the Arizona identity theft and forgery statutes." *Id.* at *13. In a subsequent opinion, the court went on to hold that "documents presented solely to comply with the federal employment verification system could [not] be used for state law enforcement purposes" even if "they were not physically attached to a Form I-9." *Puente Ariz. v. Arpaio*, No. CV–14–01356–PHX–DGC, 2017 WL 1133012, at *8 (D. Ariz. Mar. 27, 2017). At the same time, the court concluded that "Congress did not intend to preempt state regulation of fraud outside the federal employment verification process." *Id.* at *7. And it concluded that state authorities could use the same documents as the basis for a prosecution "if they were also submitted for a purpose independent of the federal

employment verification system, such as to demonstrate ability to drive or as part of a typical employment application." *Id.* at *8.

I agree with the views of the Minnesota and Kansas courts. "Use" is an inherently ambiguous term. *See Arizona v. Inter Tribal Council of Ariz., Inc.,* 570 U.S. ___, ___, 133 S. Ct. 2247, 2254 (2013) (describing the verb use as "elastic"). In context, 8 U.S.C. § 1324a(b)(5) establishes an *evidentiary* bar on the use of I-9 paperwork other than in certain enumerated federal prosecutions. If Congress had intended the I-9 and attachments to be *totally off-limits* to federal and state agencies other than for the listed federal prosecutions it would have worded the statute much differently—i.e., as a limitation on disclosure. For example, given the Arizona federal district court's interpretation, it would be unlawful for the FBI to obtain an employee's I-9 and attachments from an employer in the course of a terrorism investigation of that employee, because the offenses under consideration were not listed in section 1324a(b)(5). That seems absurd to me.[7]

In *Chamber of Commerce of the United States v. Whiting*, the Supreme Court indicated that § 1324a(b)(5) does not prohibit an employer from showing that it complied with the I-9 process to defend against a state criminal prosecution without using "the I-9 form or its supporting documents themselves." 563 U.S. 582, 603 n.9, 131 S. Ct. 1968, 1982 n.9 (2011). Similarly, I do not believe § 1324a(b)(5) by its terms prohibits Iowa from prosecuting Martinez for using a false state identification card to obtain employment, so long as it does not rely on

---

[7]The district court's latest opinion, in my view, must overcome an additional interpretive obstacle. Section 1324a(b)(5) refers to "information . . . appended to such form." 8 U.S.C. § 1324a(b)(5). If the document has been submitted to the employer but not attached to the I-9, it has not been "appended to such form."

the I-9 paperwork retained by the employer to do so. And in fact, Martinez concedes that "[t]here probably is not express preemption" in this case based on § 1324a(b)(5). And the court today does not rely on express preemption.

Yet, § 1324a(b)(5) highlights another flaw in the majority's preemption ruling. The fact that Congress included a narrow and specific preemption clause in that section limited to the I-9 undermines the majority's view that Congress actually preempted all prosecutions of unauthorized aliens (but only unauthorized aliens) for using false identities to obtain employment. Why write a narrow preemption clause if the entire field was preempted?[8]

### III. Felony Forgery Is Not Preempted Either.

It is easy for me to conclude that federal immigration law does not preempt a prosecution of Martinez for general forgery or identity theft. *Felony* forgery presents a somewhat closer question, however. Forgery is a class "D" felony "if the writing is or purports to be . . . [a] document prescribed by statute, rule, or regulation for entry into or as evidence of authorized stay or employment in the United States." *See* Iowa Code § 715A.2(2)(*a*)(4).

Iowa Code section 715A.2(2)(*a*)(4) became law in 1996. *See* 1996 Iowa Acts ch. 1181, § 3. Almost all the changes affected by this legislative package relate to the hiring of unauthorized aliens. *See id.* § 1–4. Section 1 requires employers who actively recruit non-English speaking residents of other states more than 500 miles away to provide a

---

[8]Additionally, the majority's suggestion that Martinez would not have needed to commit forgery if it hadn't been for federal law should be rejected. When Martinez went to work at Packers Sanitation, even if the I-9 requirement never existed, she would have had to give some identity including a social security number for federal and state tax purposes.

written statement, signed by the employee, that "possession of forged documentation authorizing the person to stay or be employed in the United States is a class 'D' felony." *Id.* § 1 (codified at Iowa Code § 91E.3(1)(*e*) (2013)). Section 2 makes knowing possession of a forged document a crime. *Id.* § 2 (codified at Iowa Code § 715A.2(1)(*d*)). Section 3 adds to the list of documents covered by Class D forgery felony "[a] document prescribed by statute, rule, or regulation for entry into or as evidence of authorized stay or employment in the United States." *Id.* § 3 (codified at Iowa Code § 715A.2(2)(*a*)(4)). Section 4 imposes a civil penalty on an employer who knowingly hires an employee who is not authorized to be employed in the United States or whose documentation evidencing authorized stay or employment is known to be false, subject to the safe harbor in Title 8 U.S.C. § 1324a(b). *Id.* § 4 (codified at Iowa Code § 715A.2A). The preamble to the legislation describes it as

> AN ACT relating to the crime of forgery, by prohibiting the knowing possession of forged writings, including documents prescribed for entry into, stay, or employment in the United States, and providing criminal penalties and providing civil penalties for employers hiring individuals with forged documents regarding the individuals' entry into, [stay], or employment in the United States.

*Id.* The fiscal note for the legislation estimated that the law would result in 1000 new criminal convictions annually in Iowa, on the theory that "approximately 1,000 deportations of persons apprehended in Iowa occur each year and possession of forged documents are applicable to all such deportations." S.F. 284, 76th G.A., 2d Sess. fiscal note (Iowa 1996).

This case of course involves Section 3 of the 1996 legislation. Section 3 is not a facially neutral law. It was written to address unauthorized immigration, and the law piggybacks verbatim on the following federal language:

> Whoever knowingly forges, counterfeits, alters, or falsely makes any . . . document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such . . . document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made . . . .

18 U.S.C. § 1546(a).

Yet I would conclude that the law does not cross the line set forth in *Arizona*. Our legislature did not intrude within an exclusively federal domain or criminalize conduct that Congress had opted not to criminalize; instead, it placed a state criminal sanction on top of a federal criminal sanction in an area that states *can* regulate. Also, the *practical* applications of the Arizona law upheld in *Puente Arizona* and the Iowa law are probably similar. Both cover basically the same conduct. Both would apply to an American citizen's use of forged documents when seeking employment—in addition to an unauthorized alien's use of such documents.

The majority's discussion of felony forgery in Part III.D rests on additional out-of-context case quotations. As I've already explained at length, *Arizona* does not bar states from criminalizing conduct that federal immigration law also criminalizes, outside of those areas like alien registration and unlike alien employment where field preemption applies. So *Arizona* does not help the majority. The majority's quotations from *Valle del Sol Inc. v. Whiting* and *Georgia Latino* are also taken out of context and do not aid the majority's position. In both instances the laws at issue related to alien harboring and transportation, an area where Congress has fully occupied the field. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1012 (9th Cir. 2013); *Ga. Latino*, 691 F.3d at 1256. That consideration, and only that consideration, prevented the

states from "layer[ing] additional penalties atop federal law." *Ga. Latino*, 691 F.3d at 1267; *see also Valle Del Sol Inc.*, 732 F.3d at 1027. Layering is not generally prohibited, though, and we commonly see parallel state and federal criminal laws covering the same misconduct. In the typical case, both sets of laws are equally enforceable.

**IV. Conclusion.**

I accept the representations of defense counsel that defendant Martha Martinez was born in Mexico and brought to this country by her parents when she was eleven years old. I accept the further representations that she has lived in this country for the last twenty years, just wants to work here to make ends meet, and would not consider Mexico her home.

But the majority's ruling will apply to all unauthorized aliens who use a false identity to work in this state, whether they are as sympathetic as Martinez or not. An unauthorized alien who is working under an alias to avoid paying taxes or cover up a criminal history will also reap the benefit of today's decision. At the same time, an American citizen who is just as sympathetic as Martinez will not benefit from today's decision. Our job should not be to pick winners or losers but to apply federal law as given to us by Congress and state law as given to us by the general assembly.[9]

I want to close by noting an irony in today's ruling. According to the majority, federal law preempts criminal fraud committed by an unauthorized alien only where the purpose of the fraud is to obtain work. Hence, while Martinez cannot be prosecuted for using her false Iowa

_____

[9]In my view, we also should not be using our opinions as a platform for criticizing a county attorney. I will leave any response to that criticism to the county attorney himself.

identification *to get herself hired by an Iowa* employer, she can be prosecuted for using that same false identification *to cash her employer's paycheck at a bank*. When a court decision rests on such a diaphanous distinction, that is another reason to question it.

For all the reasons I have stated, I respectfully dissent.

Waterman and Zager, JJ., join this dissent.